[Cite as *In re B.C.*, 191 Ohio App.3d 739, 2010-Ohio-6377.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

IN RE B.C.

CASE NO.  8-10-03

**O P I N I O N**

Appeal from Logan County Common Pleas Court
Juvenile Division
Trial Court No. 2009 JD 0151

Judgment Affirmed

Date of Decision:   December 27, 2010

APPEARANCES:

      **Miranda A. Warren, for appellant.**

      **Deborah K. Wolf, for appellee.**

      ROGERS, Judge.

{¶ 1} Defendant-appellant, B.C., appeals from the judgment of the Court of Common Pleas of Logan County, Juvenile Division, adjudicating him as a delinquent child on one count of receiving stolen property. On appeal, B.C. argues that the trial court's decision constituted an abuse of discretion because the adjudication of B.C. as a delinquent child was against the manifest weight of the evidence. Based on the following, we affirm the judgment of the juvenile court.

{¶ 2} On September 14, 2009, the Logan County sheriff's office filed a complaint alleging that B.C. was a delinquent child on one count of receiving stolen property in violation of R.C. 2913.51, a misdemeanor of the first degree if committed by an adult. The complaint arose from an incident during which B.C. was found to be involved in a scheme to exchange approximately $200 in Japanese yen at a local bank. B.C. and two other juveniles had taken the foreign currency from a wallet that they found while at school. The wallet belonged to one of their high school classmates. B.C. subsequently entered a denial to the complaint.

{¶ 3} The case proceeded to trial on January 22, 2010, and March 11, 2010. The first witness to testify was K.O. K.O., a Japanese exchange student at Bellefontaine High School, testified that on Thursday, September 3, 2010, he lost his wallet while at school. K.O. stated that his wallet had contained $500 in American currency and approximately $200 in Japanese yen. K.O. testified that

the wallet also held pictures from Japan and an address card with the local address of K.O.'s American host parents. K.O. reported his wallet lost to school administrators that day. K.O. testified that the next day, Friday, September 4, 2009, an announcement was made during first period over the school's loudspeaker system, informing the student body that a student had lost his wallet at the school the day before.

{¶ 4} A.M., also a student at Bellefontaine High, was the next witness to testify. A.M. stated that on Thursday, September 3, 2009, he found a wallet under the bleachers in the gym of the high school. A.M. was sitting on the bleachers with another student, B.F., at the time he found the wallet. A.M. stated that he immediately noticed a large amount of money in the wallet. Specifically, A.M. recalled that the wallet contained $500 and a large amount of Japanese yen. A.M. testified that B.C. met up with him and B.F. in the gym a few minutes after the wallet was found. The three juveniles discussed the wallet and the money inside. A.M. kept the wallet for the rest of the school day. At the end of the school day, A.M. gave B.F. a portion of the money.

{¶ 5} A.M. admitted that he heard the loudspeaker announcement regarding K.O.'s lost wallet the next day during first period. Despite hearing the announcement, A.M. decided to keep the wallet through the Labor Day weekend. However, on Tuesday, September 8, 2009, A.M. brought the wallet back to

school. A.M. gave the wallet to B.F. with all the money remaining inside less the amount he had given to B.F. a few days before. A.M. recalled that the wallet contained a card with some writing on it.

{¶ 6} B.F. was the next witness to testify. B.F. confirmed that he and A.M. were sitting in the gym after lunch on Thursday, September 3, 2009, when they found the wallet under the bleachers. B.F. also admitted that A.M. gave him some of the money later that day.[1] B.F. recalled hearing the announcement the following day indicating that a student had lost a wallet the day before. B.F. testified that after the weekend, on Tuesday, September 8, 2009, A.M. gave him the wallet with the remaining amount of money still inside.

{¶ 7} B.F. testified that on the same day that A.M. gave him the wallet, he went to B.C.'s house after school. B.F. gave B.C. $20 so that B.C. could put some minutes on his cell phone. The two juveniles then enlisted the help of B.C.'s 20-year-old friend, Derrick Fuerst, to exchange the Japanese yen. B.F. recalled that he had previously researched the exchange rate on the Internet to determine that the wallet contained approximately $200 in Japanese yen. B.F. testified that Fuerst agreed to call a local bank to inquire about the procedure for exchanging foreign currency. The bank informed Fuerst that a valid identification card was required to exchange the money. B.F. testified that they elected Fuerst to

---

[1] There is inconsistent testimony regarding the amount of money from the wallet given to B.F. A.M. testified that it was $200 while B.F. testified that it was only $100. However, the exact amount of money given to B.F. is immaterial to the outcome of this case.

exchange the currency because he was the only adult with identification. B.F. testified that he and B.C. each agreed to give Fuerst a portion of their share of the exchanged money. Fuerst also provided testimony confirming that B.C. and B.F. agreed to give him some of the money after he exchanged it.

{¶ 8} B.F. explained that while Fuerst went to the bank to exchange the yen, he and B.C. went to the Speedy Mart up the street to wait for Fuerst. However, unbeknownst to Fuerst, the local banks had been advised to report to law enforcement anyone attempting to exchange foreign currency. Fuerst was subsequently arrested by law enforcement at the bank. B.F. stated that upon seeing the police arrive at the bank, he and B.C. left the Speedy Mart and returned to B.C.'s house.

{¶ 9} Officer Jason Lapp of the Bellefontaine Police Department testified that he received a dispatch regarding a suspicious male attempting to exchange foreign currency at a local bank. Lapp arrived at the bank where Fuerst was identified as the individual attempting to exchange approximately $200 of Japanese yen. Upon further investigation, Lapp ascertained that B.F. and B.C. were also part of the currency-exchange scheme. Lapp located the two juveniles at B.C.'s house, where B.F. led police to K.O.'s wallet, which B.F. had discarded in the woods behind B.C.'s residence. Lapp recalled that pictures and a card with K.O.'s American host parents' address were still contained in the wallet.

{¶ 10} B.F., B.C., and Fuerst were taken into custody. Law enforcement recovered the Japanese yen and $325. The money and the wallet and its contents were then returned to K.O. by law enforcement. B.C. was charged with receiving stolen property as a result of the incident.

{¶ 11} After hearing all the evidence, the juvenile court found B.C. to be a delinquent child on one count of receiving stolen property in violation of R.C. 2913.51, a misdemeanor of the first degree if committed by an adult. The juvenile court identified three facts that it found determinative in rendering its decision: (1) the wallet contained objects that could identify the owner, (2) a loudspeaker announcement was made to the entire school the day after the wallet was found, and (3) the hasty manner in which the wallet was discarded after the money was taken from it indicated that B.F. and B.C. knew what they did was wrong. The juvenile court placed B.C. on community control and ordered him to pay restitution to K.O.

{¶ 12} It is from this finding of delinquency that B.C. appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

Appellant's conviction is against the manifest weight of the evidence.

*Assignment of Error No. II*

Trial court's decision to find appellant guilty of receiving stolen property constituted an abuse of discretion and is not supported by and is against the manifest weight of the evidence.

{¶ 13} Due to the nature of B.C.'s assignments of error, we elect to discuss them together.

*Assignments of Error No. I and II*

{¶ 14} In his first and second assignments of error, B.C. argues that the juvenile court's finding of delinquency is against the manifest weight of the evidence and constitutes an abuse of discretion. Specifically, B.C. maintains that the prosecution failed to prove beyond a reasonable doubt that he received K.O.'s wallet knowing or having reasonable cause to believe that the wallet had been obtained through a theft offense. We disagree.

{¶ 15} A review of the manifest weight of the evidence in a juvenile-delinquency adjudication is the same as for criminal defendants. *In re B.O.J.,* 10th Dist. Nos. 09AP-600, 09AP-601, and 09AP-602, 2010-Ohio-791, ¶ 6. When an appellate court analyzes a conviction under the manifest-weight standard, it must review the entire record, weigh all the evidence and all the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact-finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541,

quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Only in exceptional cases, when the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. Id.

{¶ 16} Moreover, a trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. See *State v. Boles*, 2d Dist. No. 23037, 2010-Ohio-278, ¶ 17-18, citing Black's Law Dictionary (8th Ed.Rev.2004) 11. When applying the abuse-of-discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *State v. Nagle* (June 16, 2000), 11th Dist. No. 99-L-089, 2000 WL 777835, citing *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219.

{¶ 17} Here, B.C. was accused of receiving stolen property in violation of R.C. 2913.51. R.C. 2913.51(A) provides: "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." B.C.'s primary contention on appeal is that because K.O.'s wallet was lost and not stolen, the prosecution failed to demonstrate that a theft offense had occurred and, therefore, failed to prove the offense of receiving stolen property. While it is undisputed by the parties that K.O. initially lost his wallet in the gym of

Bellefontaine High School, the testimony at trial supports the finding that a subsequent theft of the wallet had occurred.

{¶ 18} Common-law principles governing finder's law shed some light on the intricacies of this case. If the finder of lost property has reasonable grounds to believe that the finder knows the owner or the owner can be found, the finder cannot appropriate the property to his or her own use as against the owner. See *Baker v. State* (1876), 29 Ohio St. 184; see also 1 Ohio Jurisprudence 3d (2010) Abandoned Property, Section 14. The finder's belief or reasonable grounds of belief regarding finding the owner of the lost property are determined, not by the degree of diligence that he or she might be able to use, *but by the circumstances apparent to the finder at the time of the property is found.* See *Brooks v. State* (1878), 35 Ohio St. 46. When property belonging to another is found and the circumstances apparent to the finder at the time that the property was found indicate that the property is lost, as opposed to abandoned, the finder can be guilty of larceny if at the time of taking the property the finder intends to steal it. See id.

{¶ 19} However, with regard to the modern statutory offense of theft, the court in *State v. Porter* (Jan. 25, 1995), 9th Dist No. 16769, 1995 WL 28997, observed that "[w]hile it is true that the common law offense of larceny required a finder to intend to steal property at the time he took the property into his

possession, R.C. 2913.02[2] expands upon the common law principle by allowing a theft conviction if the finder knowingly exerts control over the property with purpose to deprive the owner of such property." *Porter* at *2. In that case, Porter, the defendant, found food stamps on the floor of his car that belonged to a woman who had been a passenger in his car the day before. Id. at *1. The evidence demonstrated that Porter had reasonable grounds to believe that the food stamps belonged to the woman. Id. Despite this knowledge, Porter took the food stamps to a convenience store where he exchanged them for cash. Id. The court found that the evidence supported that Porter possessed the requisite intent for the offense of theft because he "knowingly exerted control over the food stamps with [the] purpose to deprive [the woman] of her ownership by trading them for cash." Id. at *2.

{¶ 20} In applying the principles discussed above to the case at hand, we believe that the evidence supports the juvenile court's adjudication of B.C. as a

---

[2] R.C. 2913.02(A)(1) provides that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [w]ithout the consent of the owner or person authorized to give consent."

delinquent child on one count of receiving stolen property. A.M., B.F., and B.C. noticed the large amounts of American and foreign currency contained in the wallet shortly after it was found. All three boys were present at school when the announcement was made over the loudspeaker informing the student body that a student had lost a wallet with a large amount of money and requesting anyone with information regarding the wallet to see school officials. Even though there was no direct evidence indicating that B.C. heard the announcement, both A.M. and B.F. testified that they each heard the announcement. Moreover, there was ample testimony presented that in addition to the $500 and the $200 in Japanese yen, the wallet also contained pictures of K.O. in Japan and a card providing the local address of K.O.'s American host parents. All of this evidence put B.C. and the other juveniles on notice as to who might have lost the wallet and how to return the wallet to the owner. Therefore, the record demonstrates that the circumstances apparent to the boys around the time the wallet was found provided them with reasonable grounds to believe that the owner of the lost wallet could be found.

{¶ 21} Moreover, although not explicitly addressed by the trial court, there was ample evidence presented that the offense of theft was committed with respect to K.O.'s lost wallet. The testimony showed that after finding K.O.'s wallet, A.M. kept it until the end of the school day and then gave a portion of the American currency to B.F. Despite hearing the announcement indicating that a student had

lost his wallet, A.M. kept the wallet through the weekend. A few days after the long weekend, A.M. gave the wallet to B.F., who together with B.C., devised a plan to exchange the money with the help of Fuerst. B.F. testified that he and B.C. planned to keep the money, each getting half, after Fuerst exchanged it.

{¶ 22} We believe that the evidence supports a finding that at least one of the juveniles, if not all three, at some point knowingly exerted control over the wallet and the contents inside with the purpose of depriving K.O. of ownership without his consent, thus constituting the offense of theft. Accordingly, there was sufficient evidence that B.C. received property belonging to another, knowing or having reasonable cause to believe that the property had been obtained through commission of a theft offense. Therefore, we conclude that the juvenile court's adjudication of B.C. as a delinquent child on the charge of receiving stolen property was supported by the manifest weight of the evidence and was not an abuse of discretion.

{¶ 23} Accordingly, we overrule B.C.'s first and second assignments of error.

{¶ 24} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the juvenile court.

Judgment affirmed.

WILLAMOWSKI, P.J. and PRESTON, J., concur.